Jason R.N. Monteleone, ISB No. 5441
JOHNSON & MONTELEONE, L.L.P.
405 South Eighth Street, Suite 250
Boise, Idaho 83702
Telephone: (208) 331-2100
Facsimile: (208) 947-2424
*jason@treasurevalleylawyers.com*

Eric S. Rossman, ISB No. 4573
*erossman@rossmanlaw.com*
Erica S. Phillips, ISB No. 6009
*ephillips@rossmanlaw.com*
ROSSMAN LAW GROUP, P.L.L.C.
737 N. 7th Street
Boise, Idaho  83702
Telephone: (208) 331-2030
Facsimile:   (208) 342-2170

Attorneys for Relator/Plaintiff

# IN THE UNITED STATES DISTRICT COURT
# IN AND FOR THE DISTRICT OF IDAHO

UNITED STATES OF AMERICA *ex rel.*
JULIE MADSEN, M.D., an individual,

     Relator/Plaintiff

v.

ST. LUKE'S HEALTH SYSTEM, LTD., an
Idaho Corporation, ST. LUKE'S McCALL,
LTD., an Idaho Corporation, IDAHO ELKS
REHABILITATION HOSPITAL, INC., an
Idaho Corporation, WARREN GUDE, M.D.,
RAYMOND OTTO, M.D., and John/Jane
Does I through X, whose true identities are
presently unknown,

     Defendants

Case No.  1:15-cv-00210-EJL

**THIRD AMENDED COMPLAINT
AND DEMAND FOR JURY TRIAL**

COMES NOW Relator/Plaintiff, Julie Madsen, M.D., by and through her attorneys of record, Rossman Law Group, P.L.L.C., and Johnson & Monteleone, L.L.P., and hereby pleads, complains, alleges, and avers as allowed by this Court's *Order* (Dkt. 63). The allegations set forth below comprise the third amendment of the original complaint, as the *First Amended Complaint and Demand for Jury Trial* (Dkt. 62), filed previously in these proceedings, was erroneously identified as the first amendment, when it was, in fact, the second amendment of the original complaint. As her third, amended complaint, Relator/Plaintiff pleads the following:

## **INTRODUCTION**

1.     This is an action brought, in part, by Julie Madsen, M.D., Relator, to recover damages and civil penalties on behalf of the United States of America arising from false statements, false claims, and/or reverse false claims made, presented, or caused to be made or presented to the United States of America and/or the state of Idaho by Defendants in violation of the federal False Claims Act ("FCA"), 31 U.S.C. § 3729, *et. seq.*, as amended.

2.     Relator, individually and on behalf of the United States of America, seeks through this action to recover damages and civil penalties arising from false claims and statements involving Defendants' false and inaccurate billings provided to and false claims for reimbursement submitted to Medicare and Medicaid. Defendants have engaged in serious improprieties, and significant evidence supports verifiable allegations premised on those improprieties. Defendants were obligated to disclose accurate and truthful information on all governmental billings to and claims for reimbursement submitted to Medicare and Medicaid and to otherwise comply with the applicable federal regulations regarding claims for reimbursement submitted to Medicare and Medicaid.

**THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL -- 2**

3.      Defendants participated and conspired in the f a l s e  c l a i m  schemes and so violated the federal FCA, 31 U.S.C. § 3729(a)(3), by conspiring to defraud the federal government and/or the state g o v e r n m e n t by getting false or fraudulent claims allowed or paid by Medicare, Medicaid, and/or other federal-funded and/or state-funded healthcare programs.

## JURISDICTION AND VENUE

4.      Relator realleges the foregoing paragraphs as though set forth *in haec verba.*

5.       This is a civil action arising under the laws of the United States to redress violations of 31 U.S.C. §§3729 and 3730.  As such, this Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. §1331 and 31 U.S.C. §3733, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to the FCA.

6.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. §3733(a), among other legal authorities, because that section authorizes nationwide services of process, and because Defendants have the necessary minimum contacts with the United States. Moreover, the Defendants can be found in, reside in, and/or transacts business in the state of Idaho.

7.     Venue is proper in this District pursuant to 28 U.S.C. §1391 and 31 U.S.C. §3733(a) because the Defendants can be found in, reside in, and/or transact business in the District of Idaho.

8.      The facts and circumstances of Defendants' violations of the federal FCA have not been publicly disclosed in a criminal, civil, or administrative hearing, nor in any congressional, administrative, or General Accounting Office or Auditor General's report, hearing, audit, or investigation, or in the news media.

**THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL -- 3**

9.      Relator is the original source of the information upon which this Complaint is based, as that phrase is used in the federal FCA, and she provided disclosures of the allegations of this Complaint to the United States prior to the filing of the instant Complaint.

10.     Promptly following the filing of this Complaint, Relator will serve a copy of this Complaint and an appropriate summons and written disclosure of substantially all material evidence and information Relator possesses upon the United States Attorney for the District of Idaho.

## PARTIES

11.     Relator realleges the foregoing paragraph as though set forth *in haec verba.*

12.     Relator, Julie Madsen (hereinafter "Relator" or "Dr. Madsen"), at all times herein mentioned was and has been, and presently is, a resident of Ada County, Idaho. Relator brings this action for violations of the FCA on behalf of themselves and on behalf of the United States of America pursuant to 31 U.S.C. § 3730(b)(1). Relator has personal knowledge of Defendants' submission of false claims to Medicare and/or Medicaid as alleged herein.

13.     Defendant, St. Luke's Health System, Ltd. (hereinafter "St. Luke's"), at all times herein mentioned was and is an Idaho corporation authorized to conduct business within the state of Idaho and having its principal place of business in Boise, Idaho. St. Luke's business address is 190 E. Bannock Street, Boise, Idaho 83712, and its registered agent for service of process is Christine Neuhoff, 190 E. Bannock Street, Boise, Idaho 83712.

14.     Defendant, St. Luke's McCall, Ltd. (hereinafter "St. Luke's McCall"), at all times herein mentioned was and is an Idaho corporation authorized to conduct business within the state

of Idaho and having its principal place of business in Boise, Idaho.  St. Luke's McCall's business address is 190 E. Bannock Street, Boise, Idaho  83712, and its registered agent for service of process is Christine Neuhoff, 190 E. Bannock Street, Boise, Idaho  83712.

15.    Defendant, Idaho Elks Rehabilitation Hospital, Inc. (hereinafter "Elks"), at all times herein mentioned was and is an Idaho corporation authorized to conduct business within the state of Idaho and having its principal place of business in Boise, Idaho.  Elks' business address is 600 N. Robbins Road, Boise, Idaho  83701, and its registered agent for service of process is Melissa Honsinger, 600 N. Robbins Road, Boise, Idaho  83701.

16.    Defendant, Warren Gude, M.D., is a physician licensed in the state of Idaho to practice medicine and who was an employee and/or agent for the organizational Defendants identified herein.  At all times herein mentioned, Defendant Gude was, has been, and presently is a resident of Ada County, Idaho.

17.    Defendant, Raymond Otto, M.D., is a physician licensed in the state of Idaho to practice medicine and who was an employee and/or agent for the organizational Defendants identified herein.  At all times herein mentioned, Defendant Otto was, has been, and presently is a resident of Ada County, Idaho.

18.    Defendants John/Jane Does I through X, are individuals or entities, political, corporate, or otherwise, whose true identities are unknown at the present time but who engaged in activities and conduct set forth herein.  Alternatively, John/Jane Does I through X, whose true identities are presently unknown, are individuals or entities who are now, or at material and operative times were, the agents, employees, independent contractors, subdivisions, franchisees, wholly-owned subsidiaries, or divisions of Defendants herein, or are/were individuals or entities acting on behalf of, or in concert with, Defendants herein.

## FACTS COMMON TO ALL CAUSES OF ACTION

19.     Relator realleges the foregoing paragraphs as though set forth *in haec verba.*

20.     Defendants fraudulently billed and concealed information to avoid detection of fraudulent billing submitted to Medicare and Medicaid for reimbursement.  As is set forth above, Defendants are medical facilities and/or physicians who are participating providers under the governmental Medicare and Medicaid programs.

21.     In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare Program to provide health insurance for the elderly and disabled. Medicare is a health insurance program for:  people age 65 or older, people under age 65 with certain disabilities, and people of all ages with end-stage renal disease (i.e. permanent kidney failure requiring dialysis or a kidney transplant).

22.     For purposes of the instant action, Medicare has primarily two parts:  Part A, the Basic Plan of Hospital Insurance and Part B, which covers physicians' services and certain other medical services not covered by Part A.  Medicare Part A (Hospital Insurance) helps cover inpatient care in hospitals, including acute care general hospitals such as St. Luke's, critical access hospitals, and skilled nursing facilities (not custodial or long-term care).  Medicare Part A also helps cover hospice care and some home health care. Medicare Part B (Medical Services Insurance) helps cover doctors' services and outpatient care.  It also covers some other medical services that Part A does not cover (e.g. physical and occupational therapist services, etc.).  Part B also helps pay for covered healthcare services and supplies when they are medically necessary.

23.   Payments to healthcare providers, including Defendants, are made from the Medicare Program and come from a trust fund, known as the Medicare Trust Fund, which is funded through payroll deductions taken from the members of the American work force in addition to governmental contributions.   Over the last forty (40) years, the Medicare Program has enabled the elderly and disabled to obtain necessary, medical services from healthcare providers throughout the United States.

24.   The Medicare Program is administered through the United States Department of Health and Human Services ("HHS") and, specifically, the Centers for Medicare and Medicaid Services ("CMS"), a sub-agency and division of HHS. Much of the daily administration and operation of the Medicare Program is managed through private insurers under contract with the federal government, specifically and particularly CMS.

25.   Under Medicare Part A, contractors serve as "fiscal intermediaries" administering Medicare in accordance with the rules and regulations developed by the Health Care Financing Administration ("HCFA") now known as CMS.

26.   Under Medicare Part B, the federal government contracts with insurance companies and other organizations known as "carriers" to handle payments for physicians' services in specific geographic areas. These private insurance companies, or "Medicare Carriers," are charged with and responsible for accepting Medicare claims, determining coverage, and making payments from the Medicare Trust Fund.

27.   The principal function of both intermediaries and carriers is to make and audit payments for CMS services to assure that federal funds are spent properly.   To participate in the Medicare Program, providers must assure that their services are

provided economically and only when and to the extent they are medically necessary. Medicare will only reimburse costs for medical services that are needed for the prevention, diagnosis, or treatment of a specific illness or injury as categorized by Common Procedure Terminology ("CPT") codes and/or ICD-9 and/or ICD-10 diagnosis codes.

28.     Medicaid was created in 1965, at the same time as Medicare, when Title XIX was added to the Social Security Act. The Medicaid program aids the i n d i v i d u a l states in furnishing medical assistance to eligible, needy persons, including indigent and disabled people. Medicaid is the largest source of funding for medical and health-related services for America's poorest people. Medicaid is a cooperative federal-state public assistance program which is administered by the individual states. Funding for Medicaid is shared between the federal government and those state governments that choose to participate in the program.

2 9 .    Title XIX of the Social Security Act allows considerable flexibility within the various states' Medicaid plans, and therefore, specific Medicaid coverage and eligibility guidelines vary from state to state. However, in order to receive federal matching funds, a state Medicaid program must meet certain minimum coverage and eligibility standards and requirements.    A state must provide Medicaid coverage to needy individuals and families in five broad groups:  pregnant women, children and teenagers, seniors, people with disabilities, and people who are blind.  In addition, the state Medicaid program must provide medical assistance for certain basic services, including inpatient and outpatient hospital services.

30.     Idaho Department of Health and Welfare ("IDHW") administers the Idaho Medicaid program and provides health insurance to many Idahoans. This program pays for hospital services, doctor visits, prescriptions, nursing home care, and other healthcare needs. Idaho Medicaid is the largest social services program in state government.

31.     The complexity and financial magnitude of the federal and state healthcare programs, including the Medicare and Medicaid programs, create the incentive and opportunity for pervasive fraud and abuse.

32.     As participating providers under the federal Medicare and Medicaid programs, Defendants had the obligation to provide true and accurate billings and claims for reimbursement to the Centers for Medicare and Medicaid services (hereinafter "CMS").

33.     To the best of Relator's knowledge and belief, the fraudulent billing practices committed by Defendants that form the basis of this Complaint are continuing to the present day.

34.     Relator qualifies as a relator under the FCA with her independent and original-source knowledge of the fraudulent billings and claims for reimbursement made to the federal government, specifically CMS.

35.     Defendants St. Luke's and Elks jointly own the Centers for Wound Healing and Hyperbaric Medicine (hereinafter "Center" or "Wound Center") by a joint venture partnership.

36.     Relator was employed by Defendant St. Luke's as a physician at the Center and also as Medical Director of the St. Luke's McCall Clinic (hereinafter "McCall Clinic").

37.     Relator first began her employment with St. Luke's Health System, Ltd., on October 1, 2011 pursuant to a Physician Employment Agreement, which was amended on August 30, 2012 by the First Amendment to Physician Employment Agreement (collectively and hereinafter the "Agreement").

38.     Relator assumed additional responsibilities as Medical Director of the Wound Clinic at Defendants' McCall facility.

39.     Based on the Agreement between Defendants and Relator, Relator's employment compensation included:

   a.     From January 19, 2012 to May 6, 2012 an hourly salary of $88.88 per hour;

   b.     From May 6, 2012, to the date of her employment termination on May 1, 2014, a salary of $168,750.00 and a Bonus Distribution using a formula provided in Exhibit A to the amended Agreement; and

   c.     An additional $900.00 per day and $450.00 per half-day for time spent in clinics outside of the Wound Center.

40.     Relator worked at the Wound Center in a small practice group with Defendant Warren Gude, M.D., and Defendant Ray Otto, M.D.

41.     Defendants also provided telemedicine wound care services to remote facilities other than McCall, including St. Luke's Wood River facility as well as Gooding Memorial Hospital. Telemedicine is the use of telecommunication and information technologies in order to provide clinical healthcare at a distance.  It helps eliminate distance barriers and can improve access to medical services that would often not be consistently available in distant, rural communities.  Relator became aware that Elks was not complying with the federal Medicare telemedicine standards.  Specifically, Defendant Elks did not provide real-time, interactive, audio and video telecommunications between the patients and the physicians as required by Medicare and/or Medicaid regulations in order to submit claims for reimbursement to governmental programs for telemedicine services.   On multiple

occasions, Relator expressed her concerns relative to the improper billing of Medicare and/or Medicaid for telemedicine services to Cyn Newsom, who was then Defendant Elks' Executive Director.   These concerns of billing fraud were raised on the following occasions:

a.) An in-person conversation which Relator had with Defendant Gude in the week prior to March 20, 2013;

b.) An e-mail thread between Relator and Cyn Newsom, on March 20, 2013,

c.) An e-mail Relator sent to Defendant Gude on June 16, 2013, advising that Relator would no longer staff Defendants' McCall facility, since they had failed for months to provide Relator with the information she had requested on, "…[C]ompensation, control, and [Medicare billing] compliance [for telemedicine services]." This e-mail was in follow-up to a meeting the prior week in which Defendant Gude advised Relator that she needed to continue to perform the non-compliant services and to, "…[N]ot worry about it," when referencing Medicare and/or Medicaid billing improprieties.

42.    The patients being provided the non-compliant telemedicine services and care were also charged for these healthcare services with additional costs being passed on to their healthcare insurers, including private payors as well as Medicaid and/or Medicare.

43.    When Relator addressed these concerns relating to the provision of telemedicine services with Defendants, the concerns were not addressed let alone cured, and Defendant Elks refused to allow Relator to continue to provide telemedicine care and services to her previously-assigned facility and reassigned that facility to Defendant Gude.  Defendant Elks additionally refused to pay Relator her wages due for providing telemedicine services to the remote facility in McCall as well as the facilities in Hailey and Gooding.

44.    At all relevant times, Defendants knew and certainly should have known that they were required to submit true and accurate claims for reimbursement of healthcare services and that such reimbursement could not be obtained from governmental programs which had failed to properly comply with the applicable Medicare and/or Medicaid billing regulations, including, but not limited to, the regulations for billing for telemedicine services.

45.    Relator also has personal and original knowledge of fraudulent billings submitted to Medicare and/or Medicaid for reimbursement related to the provision of telemedicine services at Defendants' McCall Clinic and Wood River facility, and at Gooding Memorial Hospital:

    a.    The requirements for the provision of telemedicine services are set forth in the CMS regulations, and Defendants did not have the capability or the technologic infrastructure and equipment to comply with those CMS regulations and billing requirements.  Despite the inability to comply, Defendants continue to submit false claims to governmental payors, including Medicare and/or Medicaid, for reimbursement for telemedicine services, which billings are out of compliance and continuing to this day;

    b.    Relator wrote an e-mail to Defendant Gude, dated June 16, 2013, stating that Relator would not continue to provide telemedicine services to the McCall Clinic until she was provided satisfactory information on compensation/reimbursement, control, and compliance, as previously requested on multiple occasions, including compliance with Medicare reimbursement regulations;

     c.        Relator also sent e-mails to Ms. Newsom in March 2013 and May 2013 seeking to address Relator's concerns regarding Medicare fraud in the provision of telemedicine services to the McCall Clinic and the submission of false claims for reimbursement related thereto; and

     d.        On September 27, 2013, Relator also recorded a conversation involving herself, Defendant Gude, and Allegra Thompson from Defendant St. Luke's Human Resources Department, in which Relator again stated that she has raised repeated concerns about Medicare fraud and billing improprieties in relation to the McCall Clinic; Defendants never addressed these repeated concerns raised by Relator.

46.    This evidence amply demonstrates that Defendants were fully aware that the telemedicine services program at the McCall Clinic was not in compliance with CMS regulations and that billing Medicare and/or Medicaid for services which were not in compliance with regulations was fraudulent and amounted to the submission of false claims for reimbursement to Medicare and/or Medicaid.

47.    At all times relevant to this action, it was a violation of federal and/or state laws and/or regulations for Defendants to falsify information on claims for reimbursement to Medicare and/or Medicaid; Defendants engaged in this specific and fraudulent activity.

48.    The federal False Claims Act ("FCA"), 31 U.S.C. §3729, *et seq.*, provides in pertinent part: (a) any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; o r (3) conspires to defraud

**THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL -- 13**

the Government by getting a false claim allowed or paid, is liable to the United States Government for   a civil penalty of not less than $5,500.00 and not more than $11,000.00, plus 3 times the amount of damages which the Government sustains because of the act of that person.

49.    For purposes of the FCA, the terms "knowing" and "knowingly" mean that a person, with respect to information:  (1)  has actual knowledge of the information;  (2) acts in deliberate ignorance of the truth or falsity of the information; or  (3) acts in reckless disregard of the truth or falsity of the information; no proof of the specific intent to defraud is required to prove a violation of the FCA.  Defendants acted with this level of *scienter* at all times relevant to this action.

50.    During the United States' investigation of this matter prior to its decision to decline intervention, it was confirmed by personnel with the United States Department of Justice, the Office of the Inspector General for the United States Department of Health and Human Services, and the United States Attorney's Office for the District of Idaho that Defendants had actually submitted claims for reimbursement to CMS and, further, that such claims had been paid by CMS; these federal employees confirmed these facts to Relator and/or Relator's counsel.  U.S. attorneys and investigators specifically identified telemedicine claims submitted to CMS by Defendants St. Luke's, St. Luke's McCall, and Elks, though the appropriate audio-visual telecommunications equipment was not in place, and, further, that Medicare made payments for the reimbursement of these false claims to Defendants St. Luke's, St. Luke's McCall, and Elks for these telemedicine services.

**THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL  -- 14**

51.   The undisclosed, regulatory violations (i.e. repeated failures to utilize real-time, audio-visual telecommunications equipment for the delivery of telemedicine services) were material to CMS's decisions to pay these false claims; the federal regulations relative to the provision of telemedicine services and the submission of claims to CMS for reimbursement for such services are clearly central to the provision of this type of medical care that CMS, in administering the Medicare and Medicaid programs, would not likely have paid these claims had it known of these regulatory violations.

52.   Set forth in 42 C.F.R. § 410.78 are the Medicare regulations regarding telemedicine services. This regulation defines, "[I]nteractive telecommunications system," which is required to appropriately bill CMS for reimbursement, requires, as multimedia communications equipment that includes, at a minimum, "...[A]udio and video equipment permitting two-way, real-time interpretive communications between the patient and the distant site physician or practitioner." 42 C.F.R. § 410.78(a)(3). This regulation further states that Medicare Part B pays for certain, described services, "...[F]urnished by an interactive telecommunications system ...." 42 C.F.R. § 410.78(b). Thus, the regulations expressly provide that telemedicine services are eligible for reimbursement <u>only,</u> when an appropriate, regulatorily-provided, interactive telecommunications system is used.

53.   The foregoing, alleged violations are central to the provision of telemedicine services, and the materiality of these FCA violations are asserted with obvious materiality. In this case, the real-time, audio-visual, interactive communication is the very essence of telemedicine. *See* 42 C.F.R. § 410.78. This materiality is further demonstrated by the

fact 42 C.F.R. § 410.78(d) expressly requires that CMS will only pay for medical care provided by appropriate means of an interactive telecommunications system, unless it is only for the demonstration of educational programs in Alaska and Hawaii.

54.     Relator has and has had personal knowledge of the general cost of telemedicine services, because: 1.) telemedicine patients would bring in their bills and show them to Relator, and Relator saw bills for non-telemedicine patients, coupled and compared to other patients and had the opportunity to review the bills for telemedicine patients with mild frequency, and 2.) Relator attended meetings for the Elks Wound Care Clinic Provider Group (physicians, mid-levels, Cyn Newsom, Jessie Hardy (Financial Operations Specialist), and Ann Lawler, the governmental payments compliance officer), on a monthly basis during Relator's employment with Defendants from May 2011 until October 2014, where Medicare and/or Medicaid billing, reimbursement, and compliance for telemedicine services was specifically discussed.

55.     False and fraudulent claims were submitted to Medicare, Medicaid, CMS, and/or other governmental payors by Defendants.  Any claim submitted for reimbursement to CMS and/or other governmental payors for the provision of telemedicine services was *per se* false and fraudulent due to Defendants' improper certification to CMS and/or Defendants' failure to advise CMS and/or other governmental payors' attention of not having the necessary real-time, audio-visual telecommunications equipment to properly bill governmental payors for telemedicine services.

56.     Material to the governmental payors' decisions to reimburse Defendants was Defendants' direct, implicit, and/or tacit certification(s) that they had the necessary audio-visual,

telecommuinications equipment to be reimbursed for telemedicine services, which was required by the governing, regulatory scheme.

57.    All Defendants presented these false and fraudulent claims for telemedicine services to Medicare and/or other governmental payors, because Defendants never advised Medicare that they did not have the necessary, audio-visual telecommunications equipment to appropriately bill CMS and/or other governmental payors for telemedicine services.

58.    In light of the governing, federal regulations for billing CMS and/or other governmental payors, as cited herein, Defendants, collectively, knew or should have known that the claims being submitted for reimbursement for telemedicine services were false and fraudulent.

59.    Defendants, collectively, knowingly failed to disclose to CMS and/or other governmental payors that they did not own, possess, or utilize the necessary, audio-visual equipment to properly submit claims for reimbursement for telemedicine services.  Such information would be material to the various governmental agency's/agencies' decision(s) to pay reimbursement to Defendants for the provision of telemedicine services.

60.    At no time, did any of the named Defendants herein possess, equip, and/or provide real-time, interactive, audio-visual, telecommunications services between the patients and their healthcare providers.

61.    In order to appropriately submit a claim for reimbursement for the provision of telemedicine services, it was necessary to use a GT-modifier, which would only be used for used for the billing of telemedicine services

62.    Amy Calkins, a nurse with St. Luke's McCall, advised Relator4 that patients had complained regarding the extra fees that were charged to them in the amount of

approximately $300.00 for receiving telemedicine services. Ms. Calkins also shared with Relator that Cyn Newsom, an employee and agent of SL, and Defendant Gude had told Ms. Calkins that she needed numerous patients for telemedicine services regardless of what Relator's clinical plan was for those patients and irrespective of the cost to CMS and/or other governmental payors.

63.     Ms. Calkins made it clear to Relator that she was uncomfortable scheduling telemedicine patients, because the service was not adequate to meet the patients' needs and that the patients had complained about the significant up-charge related to the provision of telemedicine services. Ms. Calkins shared with Relator that the GT-modifier was included on the bills for patients that were receiving telemedicine services at the medical facilities set forth herein.

64.     Defendants Gude and Otto would submit provider billing sheets for each telemedicine patient to the billing department for Defendants Saint Luke's, Saint Luke's McCall and Elks, and these billing sheets would necessarily represent and/or imply that the telemedicine billing regulations and compliance requirements would be met, as set forth herein:

    a.     The billing department for Defendants Saint Luke's, Saint Luke's McCall, and Elks would submit the bills to CMS, as was specifically discussed in the Elks Wound Care Clinic Provider meetings, as referenced above; and

    b.     Defendants Gude and Otto and Cyn Newsom, an employee and agent for Defendant St. Luke's, St. Luke's McCall, and Elks,, specifically selected Conex, which was a patient management software as the software platform to be used for all telemedicine patients; however, Conex was a store-and-forward

software (i.e. not interactive, not real time, no video, and only with static photos), which clearly did not meet the CMS regulations relative to billing Medicare and/or other governmental payors for the reimbursement for the provision of telemedicine services.   Conex as the software to be used was discussed in the Elks Wound Care Clinic monthly Provider Meetings, as referenced above.   Even when Conex was fully operational, which was only part of the time, it only sent static photographs.  Relator e-mailed Cyn Newsom, an employee and agent for Defendant St. Luke's, St. Luke's McCall, and Elks, in March 2014, that the use of Conex for the provision of telemedicine services did not comply with the governing CMS regulations relative to the provision of telemedicine services, because there was no interactive, real-time, audio-visual feed between the physician(s) and the patient(s).

65.)      There were two components for the billing of telemedicine services, and these were the fee for professional service and the facility fee.   The GT-modifier used to bill for telemedicine services would be a component of the facility fee.   These details were discussed during the monthly Provider Meetings for the Elks Wound Care Clinic.  The GT-modifier was specific to billing for telemedicine services, and this was true during Relator's employment with Defendant Elks and St. Luke's.


66.)      CMS discontinued the use of the GT-modifier for billing the reimbursement of telemedicine services on January 1, 2018; prior to that date, the GT-modifier was used system-wide for the appropriate billing of telemedicine services to CMS and/or governmental payors for the reimbursement of telemedicine services.


**THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL -- 19**

67.)      Telemedicine services were used by Defendants St. Luke's, St. Luke's McCall, and Elks for the provision of wound care, critical care, neurologic, and/or other medical services from late 2011 until October 2014, when Relator ultimately separated from her employment with Defendants St. Luke's and Elks.

68.)      Devon Johnson, then, at the relevant times herein, was an employee and agent of Defendant St. Luke's, St. Luke's McCall, and Elks, suggested that Microsoft Lync be used in lieu of Conex.  However, that software had the same limitations as Conex (i.e. no real-time, interactive audio-visual component due to only the availability of static photos).  On March 8, 2013, Mr. Johnson e-mailed Defendant Gude, Cyn Newsom, and Relator, and suggested that no other telemedicine softwares be introduced, because Defendants, collectively, already had two systems that provided static photos rather than interactive, audio-visual linkage.

69.)      The personnel at the Elks Wound Care Clinic were troubleshooting the problems with Conex at the McCall, Wood River, Jerome, and Gooding facilities, and Mr. Johnson pointed out that Microsoft Lync was being used at Defendant St. Luke's Fruitland facility for telemedicine services, without issue in his opinion, though it clearly did not meet the relevant, telemedicine billing regulations from CMS and/or other governmental payors.

70.)      Relator was personally involved, as a practicing physician, in providing in-person, medical services at St. Luke's McCall during an 11-month period but was also providing

**THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL -- 20**

telemedicine services remotely, while in both the Boise and Meridian facilities, during this same period of time. This 11-month period covered November 2012 through October 2013, and, during this time, Relator was the medical director for the wound care clinic at St. Luke's McCall. During the period of time from October 1, 2011, to May 1, 2014, Relator and Defendants Gude and Otto were providing telemedicine services in the McCall, Wood River, Jerome, and Gooding facilities, though the necessary, telecommunications equipment was not being utilized by any of Defendants. During both the more narrow as well as the broader time frames, Conex was being used, which, again, did not meet the CMS requirements to properly bill for the reimbursement of telemedicine services at these facilities by Medicare and/or other governmental payors.

71.)     There were approximately 6-8 times during the time frame of approximately March 2013 to June 2013, where Relator raised the telemedicine, non-compliance issue with all of Defendants. Relator raised these legitimate concerns regarding non-compliance with CMS's telemedicine billing regulations to Cyn Newsom, Defendant Gude, and Defendant Otto, both in person and via e-mail, and each of these recipients was an agent and/or employee of Defendants St. Luke's, St. Luke's McCall, and Elks.

72.)     Defendants' actions outlined herein were material violations of federal CMS billing regulations, because they had the natural tendency to influence, or to be capable of influencing, the payment and/or receipt of money by Defendants St. Luke's, St. Luke's McCall, and Elks from CMS and/or other governmental payors.

**THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL -- 21**

73.)      Had CMS been aware that Defendants, collectively, were failing to use the
appropriate telecommunications system for the provision of telemedicine services, then
CMS would more likely than not have denied payment/reimbursement for the telemedicine
claims submitted by Defendants for reimbursement.  Thus the submission of these claims
for reimbursement were false

## FIRST CAUSE OF ACTION – SUBSTANTIVE VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. §§ 3729(a)(1) and 3729(a)(2))

74.)   Relator realleges the foregoing paragraphs as though set forth *in haec verba.*

75.)   This cause of action is for treble damages, forfeitures, and civil penalties under the federal
False Claims Act, 31 U.S.C. §§ 3729-3733, as amended, and for engaging in a conspiracy
to defraud Medicare and/or Medicaid.

76.)   By virtue of the acts described with more particularity and specificity above, Defendants
made, used, and/or caused to be made or used false records and/or statements to defraud
Medicare and/or Medicaid relative to billings made to these governmental agencies for
reimbursement for healthcare services allegedly rendered.

77.)   By virtue of the acts described with more particularity and specificity above, Defendants
knowingly submitted and/or caused to be submitted to officers, employees, and/or agents
of the United States, via CMS, Medicare, and/or Medicaid, false claims, false information,
and/or reverse false claims relative to the provision of telemedicine services all of which
caused damages to the United States.

78.)   Plaintiff, United States of America, unaware of the falsity of the claims, reverse false
claims, and/or statements made or caused to be made by Defendants and in reliance on

the accuracy thereof, paid Defendants for the claims for reimbursement for healthcare services which were based on the false statements, false claims, and reverse false claims.

79.)   By reason of the payment of the false and fraudulent claims for reimbursement which would not have been paid absent the false claims and/or false statements made by Defendants, Plaintiff, the United States of America, has suffered substantial damages.

80.)   Relator/Plaintiff has been required to retain the legal services of Rossman Law Group, P.L.L.C., and Johnson and Monteleone, L.L.P., in connection with the prosecution of this action and therefore requests that attorney fees and costs be awarded to her.

81.)   Defendants violated the federal the FCA by submitting claims for reimbursement to federal healthcare programs, including Medicare and/or Medicaid, knowing that they were ineligible for the reimbursement payments for their provision of telemedicine services.

82.)   Defendants' conduct described in this complaint was knowing, as that term is used in the FCA.

## **PRAYER FOR RELIEF**

WHEREFORE, Relator/Plaintiff, both on her own behalf as well as on behalf of the United States of America, Plaintiff in real interest herein other than relating to the second cause of action for employment retaliation, prays judgment against Defendants as follows:

1. Treble damages, civil penalties, and forfeitures for substantive violations of the federal False Claims Act, 31 U.S.C. §3729, *et seq.*, as amended;

2. For Relator's/Plaintiff's reasonable costs and attorney fees incurred herein; and

3. For such other and further relief as this Court deems just and equitable.

DATED: This ___4th___ day of September, 2018.

JOHNSON & MONTELEONE, L.L.P.

_____
Jason R.N. Monteleone
Attorneys for Relator/Plaintiff

## DEMAND FOR JURY TRIAL

Relator/Plaintiff hereby demands a trial by jury, pursuant to F.R.C.P. 38(b), on all issues

and matters for legal relief and properly triable to a jury.

DATED: This ___4th___ day of September, 2018.

JOHNSON & MONTELEONE, L.L.P.

_____
Jason R.N. Monteleone
Attorneys for Relator/Plaintiff